IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATHANIEL LINDZEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | Jury Demand |
| | ) | |
| MESSING, RUDAVSKY & WELIKY, P.C., | ) | |
| ELLEN MESSING, DAHLIA RUDAVSKY, | ) | |
| AND JAMES WELIKY | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

## INTRODUCTION

1. Plaintiff Nathaniel Lindzen ("Lindzen"), is currently an attorney who formerly worked in
the non-legal roles from 1993 until 2021. Essentially his entire career from 1993 until 2021 was
non-legal in nature. In the spring of 2017, Lindzen hired Messing, Rudavsky & Weliky, P.C.,
("Defendants" or "MRW") to represent him in an employment dispute involving such non-legal
employment. The matter was subsequently litigated first before an administrative law judge and
later in federal district court. Defendants charged excessive fees during their representation of
Lindzen because the work was often duplicative, for instance comprising duplicative charges for
work that done before the administrative agency and then later again in federal court, it was also
outright excessive in terms of the hours billed. The ultimate total of fees charged for both actions
was also unreasonable in relation to the complexity of the actions and work involved. In some

admitted instances these excessive fees were explained to Lindzen as being the result of

Defendants alleged unfamiliarity with Lindzen's cause of actions and/or Defendants' stated need

to "learn the law." This was so despite the fact that Plaintiffs describe and promote themselves

on their website as "a premier boutique ...the full spectrum of labor and employment services"

and despite the fact that Defendants appear to have over a century of combined employment law

experience.

2.  During the course of their representation of Lindzen, Defendants entered into two

separate retainer agreements with Lindzen which further obscured the duplicative and excessive

nature of their fees.  The first agreement was an hourly agreement under which Lindzen paid

MRW's hourly rate.  The second agreement, entered into by Plaintiff and Defendant, after

Defendants had reviewed discovery production and interviewed potential witnesses (at full cost

to Plaintiff) was a hybrid fee and contingency agreement.

3.  While representing Lindzen in the spring of 2021 Defendants also made a completely

unsolicited job offer to Lindzen.  Defendants at no time informed Lindzen that a conflict of

interest would arise from his simultaneous position as both employee and client.  At no time did

Defendants recommend that Lindzen obtain independent advice on the propriety or lack thereof

of the situation.  At no time did Defendants obtain informed consent from Lindzen written or

otherwise.

4.  Lindzen was unaware of the conflict and its adverse implications at the time because he

trusted his attorneys and had, with very minor exceptions, not worked as an attorney since

graduating from law school approximately eight years prior.  The conflict essentially

subordinated Lindzen's role as a client to his role as an employee and thus adversely impacted

Lindzen.

2

5. Lindzen began working for Defendants on or about May 20, 2021.

6. Over the following 18 months Lindzen worked for Defendants performing rudimentary legal and paralegal tasks on a part-time, hourly basis. During this period Lindzen routinely worked in plain sight, or with the full knowledge, of the Defendants far beyond the hours for which he was allowed, per the terms of his employment, to be paid for.

7. As one condition of his employment, Lindzen was required to be vaccinated against COVID-19 prior to working on-site for Defendants. Not long after Lindzen was vaccinated he experienced a series of adverse reactions including a glaucoma diagnosis.

8. Around January of 2022, after working on-site for Defendants for several months, Defendants implemented a new COVID-19 policy that included, among other things, a booster requirement and a further requirement that employees who travelled out of state undergo bi-weekly COVID-19 testing at their own expense prior to returning to the office.

9. Based on his personal experience and general concern regarding office safety and personal liberties, Lindzen objected verbally and in writing to the MRW's new COVID-19 policy. Lindzen further objected to repeated badgering that was occurring outside of his paid hours as regarded the new COVID-19 policy. Lindzen also requested an accommodation as regarded the new policy. Defendants then kicked Lindzen out of their office and required him to work remotely.

10. In March of 2022, shortly after his complaints regarding the new policy, Lindzen received a formal letter from Defendants at his home address, in which Defendants, for the first time, raised alleged significant concerns with his work product and further promised unspecified punitive action for his protected written objections concerning the new COVID-19 policy and the associated badgering in relation thereto that was often occurring during Lindzen's unpaid hours.

3

Thereafter his assignments were reduced and he was largely excluded from the firms social and marketing activities. This was very stressful for Lindzen and caused him emotional distress and physical manifestations thereof.

11. While working for Defendants Lindzen also made inquiries regarding his annual performance review and pension benefits. Specifically, Lindzen on several occasions, both orally and in writing, requested a Summary Plan Description ("SPD") regarding Defendants' ERISA regulated pension plan. Lindzen never received any substantive response or an SPD, nor did he ever receive an annual performance review.

12. On October 14, 2022, approximately a week after Lindzen raised follow up questions about his COVID-19 accommodation and annual performance review and approximately three weeks after his latest request for an SPD, Defendants terminated Lindzen by phone, effective at the end of the week. Because of Lindzen's part time schedule this meant that Lindzen was effectively given just two days' notice of his termination.

13. Such rapid terminations were likely in violation of MRW's internal policies which, on information and belief, required a minimum of two weeks' notice for terminations or resignations.

14. Within a day or two of his announced termination, one of MRW's owners and partners, Dahlia Rudavsky, called Lindzen and asked if he could stay on for a further unspecified number of weeks to address urgent client matters overlooked at the time his termination was announced.

15. This request belied MRW's earlier assertion that Lindzen was being terminated due to alleged lack of work.

16. Lindzen ultimately worked approximately two more weeks before being terminated on or about October 27, 2022.

4

## PARTIES

17. Plaintiff Nathaniel Lindzen is a resident of Wayland, Massachusetts. He graduated from law school in 2013 and passed the Massachusetts and New York Bar exams in 2014 but, with minor exceptions comprising a few months, continued thereafter to work in his prior and non-legal line of work. Lindzen first hired Defendants to address a dispute arising from such non-legal employment in 2017. In 2021 while still a client of Defendants he began working, ostensibly as a part-time attorney, for Defendants. He has practiced law as a solo practitioner since 2023.

18. Defendant Messing Rudavsky & Weliky, P.C. ("MRW") is a law firm and professional corporation founded around 1988, and formerly located in Boston, now located in Newton, Massachusetts. The law firm promotes itself as being ostensibly dedicated to representing employees and protecting employee rights and holds itself out on its webpage as being a "premier boutique" with "renowned expertise in discrimination work".

19. Defendant Ellen Messing ("Messing") is an attorney, founder, and one of three shareholders of the law firm Messing, Rudavsky & Weliky, P.C. She is a resident of Brookline, MA and has been licensed to practice in Massachusetts since 1977. Her thirty-two-page public resume lists, *inter-alia*, fourteen entries associated with ethical questions.

20. Defendant Dahlia Rudavsky ("Rudavsky") is one of three shareholders of the law firm Messing, Rudavsky & Weliky, P.C. She is a resident of Waban, MA and has been licensed to practice in Massachusetts since approximately 1978.

21. Defendant James Weliky ("Weliky") is one of three shareholders of the law firm Messing, Rudavsky & Weliky, P.C. He is a resident of Roslindale, MA and has been licensed to practice in Massachusetts since approximately 1995.

5

## JURISDICTION AND VENUE

22. This Court has jurisdiction pursuant to and 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)

to adjudicate Plaintiff's Employee Retirement Income Security Act of 1974 ("ERISA") and

Americans With Disabilities Act ("ADA") claims and supplemental jurisdiction pursuant to 28

U.S.C. § 1367 over Plaintiff's related state law claims.

23. Venue is proper under 28 U.S.C. § 1391 because both Plaintiff and Defendants reside in

the Federal District for the District of Massachusetts and because this same district is the location

where all of the events or omissions giving rise to the claims occurred.

## FACTS

### Breach of Fiduciary Duties and Breach of Contract

24. Around April of 2017 Lindzen arranged a paid consultation with Rudavsky and MRW.

25. Lindzen was acquainted with Rudavsky through family members who lived in the same

area as Rudavsky.

26. Lindzen consultation with Rudavsky pertained to an ongoing employment dispute with

his then employer.

27. In the summer of 2017 Lindzen was terminated from his then employment.

28. In October of 2017, Lindzen filed a complaint related to his termination alleging federal

discrimination claims before the appropriate federal agency.

29. Because Lindzen then had virtually no practical experience as an attorney, let alone as a

litigator, Lindzen also entered into an agreement with Rudavsky and MRW around October of

2017 to obtain assistance in litigating his matter before the federal agency.

6

30. Lindzen asked Rudavsky whether in light of her activities in the case it would be appropriate for her to file a formal appearance.  Rudavsky informed Lindzen that no such appearance was necessary or desirable.

31. The litigation before the federal agency and administrative law judge was extensive and involved all formal discovery related to either the agency action or subsequent and nearly identical federal action.

32. Over the course of the agency action, Rudavsky and her partners charged Lindzen approximately $40,000 for their work on his matter and did so despite not filing an appearance or arguing a single motion.

33. These charges included at least one improper entry for several hours to "learn the applicable law" or words to that exact effect that was memorialized in an email sent to Lindzen.

34. After Rudavksy and her firm had reviewed discovery produced in the agency action, re-reviewed filings, motion and orders, and spoken to potential witnesses, all of which MRW charged Lindzen for, Rudavsky offered Lindzen a new retainer agreement.

35. The new agreement proposed by Rudavsky would involve her firm and another independent attorney with whom MRW sometimes collaborated with.

36. The new agreement in contrast to the old agreement involved a non-standard hybrid hourly contingency fee arrangement.

37. Lindzen received the new fee agreement on or about January 30, 2020 and executed it sometime shortly thereafter.

38. Around July of 2020 MRW filed a federal complaint on behalf of Lindzen and notified the federal agency of same.

39. The agency action was dismissed by order of an Administrative Law Judge shortly thereafter.

40. The complaint filed by Rudavsky in the federal action was factually and substantively the same as the complaint that Rudavsky had edited and reviewed extensively during the agency action.

41. A protective order filed by Rudavsky in the federal action was substantively based on the same protective order utilized before the administrative law judge in the agency action.

42. Between the filing of the federal complaint and July of 2020 and the resolution of the matter in May of 2021 Rudavsky broke little new ground. Despite this, MRW's charges reflected fees for work that was essentially duplicative of that done before the agency.

43. While Lindzen was still a client of MRW's, Rudavsky contacted Lindzen by phone and made an unsolicited offer of employment to Lindzen.

44. Lindzen never conducted any interviews with Rudavsky or any other members of MRW.

45. Defendants were aware of Lindzen's vulnerable position and long period of involuntary unemployment from prior discussions with Lindzen regarding his efforts to find re-employment as well as discussions about Lindzen's financial position.

46. Some days later, Rudavky's partner and MRW co-owner, James Weliky emailed Lindzen to confirm Rudavsky's earlier oral offer.

47. Lindzen desperate to learn a new and marketable skill after several years of unemployment accepted the offer.

48. By making Lindzen an employee while simultaneously a client, MRW also effectively made Lindzen's role as a client subsidiary to his role as an employee.

8

49. MRW's offer of employment during ongoing representation comprised a business transaction with a client.

50. Lindzen later concluded the underlying litigation that was the subject of MRW's representation.

51. With the conclusion of the underlying litigation in which MRW represented Lindzen, Rudavsky and her partners Weliky and Messing obtained a large contingency fee that essentially comprised a double payment for their work since the federal action covered less ground than the agency action which Rudavsky had been involved in.

52. Because of his employment with MRW, Lindzen was also unable to effectively challenge the aforementioned excessive billing either then or later before the Fee Arbitration Board without losing his then only means of earning a living.

53. MRW failed to alert Lindzen in any way at all as regarded the conflict of interests inherent to any such business transaction, i.e., his simultaneous position as both client and employee of MRW. MRW also failed entirely to advise Lindzen to seek independent counsel on the propriety or ramifications of such a business transaction.

54. MRW never obtained, let alone requested, Lindzen's informed consent (orally or in writing) as regarded the conflict they created by entering into a business transaction with him. MRW thus caused damages to Lindzen by depriving Lindzen of the full value of the legal services he had paid for.

55. MRW also caused damages to Lindzen because due to the conflicted nature of MRW's representation of him he later realized he could no longer trust them as counsel and later incurred further legal fees for different counsel.

56. MRW thus violated its fiduciary and contractual obligations to Lindzen. *See BourgeoisWhite, LLP v. Sterling Lion, LLC*, 71 N.E.3d 171, 177 (Mass. App. Ct. 2017) ("lawyers owe fiduciary duties to their clients that exceed their contractual obligations").

<u>Lindzen's Employment with MRW and Wage Act Violations</u>

57. Lindzen began working for MRW on or about May 20, 2021

58. Lindzen's employment agreement with MRW specified that he would work part-time, 15-20 hours a week and also specified that he needed to clear in advance any hours beyond this.

59. Lindzen's employment agreement also specified that Lindzen would be docked 30 minutes each day for lunch. This was so even though Lindzen almost always worked through lunch.

60. Lindzen was frequently given tasks that took longer than the 15-20 hours that he was paid for.

61. Lindzen was frequently contacted by Messing, Rudavsky, Weliky, MRW clients, MRW staff, and even MRW business associates during his off-hours and off-days, not to mention his unpaid lunch breaks. These uncompensated contacts sometimes occurred over weekends.

62. Lindzen's excess hours worked were performed in plain sight or with full knowledge of Messing, Rudavsky and Weliky and/or at their own requests.

63. For instance, Messing did not object when Lindzen emailed her stating that he would not charge for time needed to train for prospective assignments and do so on-site (since no formal job training was provided at MRW).

64. For instance, Messing did not object when Lindzen emailed her and stated that he would reduce his time sheet hours to remove time spent on an assignment the partial results of which Messing later said she could not bill a client for.

65. For instance, Lindzen emailed Messing and Rudavsky on a Saturday with time-sensitive research results that both had requested. In his email, Lindzen stated he had completed the work for them the prior evening, a Friday, which was outside of his official hours. While Messing and Rudavsky stated that they were highly pleased with the research and its expedited delivery, neither felt obligated to amend Lindzen's time to reflect the additional work.

66. For instance, during a snow storm in 2022, Lindzen volunteered to pick up and deliver time sensitive files to Rudavsky's home office at night, something Rudavsky appreciated but did not pay for.

67. For instance, before leaving the employment of MRW, Lindzen tabulated roughly over eighty separate days on which he had exchanged emails with Messing, Rudavsky or Weliky on work related matters outside of the hours for which he was allowed to be compensated.

68. Lindzen had also been previously informed by MRW's former office manager, Matthew Ritter ("Ritter"), that Weliky himself reviewed Lindzen's time sheets. Because of this and other facts MRW's partners knew that they were not compensating Lindzen for all of his hours worked.

69. By knowingly underpaying Lindzen for his worked hours Messing, Rudavsky, Weliky and MRW violated the Massachusetts Wage Act.

70. In the summer of 2023 Lindzen requested a Massachusetts Wage Act "right to sue" letter from the Massachusetts Attorney General and on or about August 30, 2023 Lindzen received same.

11

### Lindzen's Employment with MRW and Retaliation for Protected Conduct

71. As one of the conditions of Lindzen's employment, Lindzen was required to undergo vaccination against COVID-19. Lindzen did so.

72. Lindzen experienced adverse reactions after his vaccinations including a diagnosis of glaucoma.

73. In January 2022, MRW updated their COVID-19 policy, requiring, among other things, that employees receive a COVID-19 booster and that employees who travelled out of state undergo bi-weekly COVID-19 testing at their own expense prior to returning to the office. This policy remained in effect after local clinics ceased offering impromptu testing.

74. Because of Lindzen's personal experiences with the COVID-19 vaccine, his strongly held beliefs that MRW' policy was an unreasonable and dangerous encroachment on the personal health and liberty of both himself and his colleagues, Lindzen objected verbally and in writing as regarded this new policy. Lindzen also objected to the infringements on inter-state travel but nevertheless agreed to comply with all aspects of MRW's policy and more so long as he could receive a health-related booster exemption.

75. Within days of objecting to the policy, Lindzen was expelled from MRW's offices and forced to work remotely even though Lindzen then had little if any direct physical contact with MRW staff, partners or clients.

76. On information and belief Messing, Rudavsky and Weliky thereafter ordered their then office manager Ritter to aggressively pursue Lindzen in an attempt to force compliance with MRW's new booster policy. This was so despite the fact that Lindzen was now working remotely by and with the prior approval of MRW which resultingly precluded any rational business justification for the booster requirement.

77. Ritter then proceeded to contact Lindzen repeatedly by way of Lindzen's personal email address and personal cell phone number requesting that Lindzen undergo a COVID-19 booster and provide prompt proof thereof. Ritter sometimes did so during Lindzen's unpaid time off.

78. On or about February 20, 2022 Lindzen wrote Ritter a letter detailing and reiterating his objections regarding the new COVID-19 policy and his reasons therefore including, *inter alia*, due to his own personal health reasons and based on the health and welfare of MRW staff generally. Lindzen also requested that Ritter's future contacts on the matter occur during Lindzen's paid versus unpaid hours and that Ritter restrict his contacts to Lindzen's work phone and work email address.

79. Lindzen's requests were in keeping with both MRW's official policy and, as he subsequently learned, the Massachusetts Wage Act.

80. In so doing Lindzen engaged in protected concerted speech made for the purpose of mutual aid under the National Labor Relations Act. *See* 29 U.S.C. §§ 157, 158. See also Nat'l Labor Relations Bd. v. Me. Coast Reg'l Health Facilities, 999 F.3d 1 (1st Cir. 2021).

81. Lindzen then or around the same time also reminded Ritter of MRW's required compliance with the Americans With Disabilities Act and related state law, and further reminded Ritter that he had requested an accommodation thereunder.

82. Lindzen's objections to MRW's policy and request for an accommodation was also protected conduct under the Americans With Disabilities Act and M.G.L. c. 151B. *See also Wright v. Compusa, Inc.*, 352 F.3d 472, 476-77 (1st Cir. 2003) (holding that a request for an accommodation is protected activity and that retaliation therefor may occur independent of disability discrimination).

83. On or about March 17, 2022 Lindzen received a letter at his home address from Messing, Rudavsky and Weliky signed "The Partners". This letter for the first time made vague and unspecified written critiques of Lindzen's work; made a thinly veiled suggestion that Lindzen voluntarily resign; alleged insubordination; and finally threatened unspecified discipline for Lindzen's alleged incivility in requesting that Ritter limit his future contacts to company approved modes of communication stating "[w]e cannot let pass your incivility to Matthew in respect to your dialogue with him about which email address to use in writing you."

84. Messing, Rudavsky and Weliky's letter and its claim of "insubordination" and "incivility" was pretext for retaliating against Lindzen for his protected conduct, i.e., raising concerns about and objecting to the updated COVID-19 policy.

85. Over the next several months tasks normally allocated to Lindzen were frequently farmed out by Messing, Rudavsky and Weliky to non-lawyer staff and/or paralegals. Messing in particular largely ceased providing Lindzen with any further assignments.

86. Prior to Lindzen's expulsion from the office, MRW staff and Messing, Rudavsky and Weliky had routinely mocked and joked about those seeking vaccine exemptions.

87. For instance, in the fall of 2021, then client intake specialist Richa Rodriguez, suggested during a weekly staff meeting that MRW turn away any clients seeking workplace vaccine accommodations as a matter of firm policy and state the same to such potential clients.

88. For instance, in the fall of 2021 MRW paralegal Michael Therrien suggested that a new automated MRW phone prompt be arranged which would provide a prompt for those seeking COVID-19 exemptions and which would automatically route any such calls for disconnection.

89. These suggestions or sarcastic remarks were met with nodding or vocal approval and chuckles by Messing, Rudavsky and Weliky.

90. In late September or early October of 2022, Lindzen reached out to Weliky regarding his COVID-19 accommodation, his annual performance review and pension benefits. Lindzen then left for a pre-planned vacation.

91. On his first day returning from vacation, on or about October 14, 2022, Rudavsky and Weliky called Lindzen and announced that he was being terminated for alleged lack of work effective later that same week and that his health insurance benefits would likewise terminate. Later, after Lindzen stated that he would have difficulty obtaining replacement health insurance on such short notice, MRW relented as regarded their initial plans to terminate Lindzen's health insurance.

92. Since Lindzen's official work schedule then comprised three days, this effectively meant that Lindzen was given just two days' notice of his termination.

93. On information and belief, MRW's official policy was that both employer and employee give at least two weeks' notice of any termination or resignation.

94. On information and belief, MRW normally provided much more than two weeks' notice of any terminations and did not seek to immediately terminate employee health insurance coverage.

95. Around a day or so after informing Lindzen that he had been terminated due to "lack of work," Rudavsky impliedly contradicted that claim by requesting that Lindzen stay on for an additional unspecified period to deal with pressing client matters.

96. Defendants had also contradicted their statement regarding an alleged "lack of work" by frequently asserting that they were extremely busy with client matters in the months preceding Lindzen's termination.

97. The timing and manner of Lindzen's termination, his treatment well before the termination and the illogical alleged basis of Lindzen's termination underscored the retaliatory nature of his termination.

98. Lindzen timely filed discrimination and retaliation charges with the Massachusetts Commission Against Discrimination ("MCAD") on or about August 9, 2023.

99. On or about January 17, 2024 Lindzen requested leave from the MCAD to withdraw his discrimination and retaliation charges so that he could file them in court.

100.    On or about February 8, 2024 Lindzen received such leave and the MCAD accordingly dismissed Lindzen's complaint.

101.    Lindzen has thus administratively exhausted his retaliation claims.


## Lindzen's Employment with MRW and ERISA Violations

102.    Around the end of November of 2021 MRW's then office manager, Ritter, had informed Lindzen that MRW had a pension plan and that employees became eligible for that plan after completing one year of employment or 1000 hours of service.

103.    After performing the requisite 1000 hours of service Lindzen was provided with no further information regarding the pension, even though under ERISA he should have been.

104.    In the Spring of 2022 having met both pension plan eligibility requirements, Lindzen began to raise this issue requesting, both orally and in writing, further information regarding the pension – these included requests for the pension fund's summary plan description ("SPD").

105.    Specifically, at least on or about August 26, 2022 Lindzen requested an SPD from Weliky by way of email. Weliky did not respond.

106.     Specifically, at least on or about September 22, 2022 Lindzen requested by way of email an SPD from MRW's then office manager, Joseph Pelletier. Pelletier acknowledged Lindzen's request but never provided an SPD or even an explanation simply responding "we're looking into it" or "stay tuned" or words substantially the same.

107.     On information and belief MRW administers its own pension plan governed by ERISA, and Rudavsky serves as the plan's administrator.

108.     Department of Labor ("DOL") regulations promulgated pursuant to ERISA mandate that plan administrators provide an SPD within 90 days of a participant becoming eligible whether requested or not. 29 CFR § 2520.104b-2.

109.     DOL regulations promulgated pursuant to ERISA mandate that plan administrators provide an SPD within 30 days of a participant requesting an SPD. 29 CFR § 2520.104b-2.

110.     On October 14, 2022 approximately 3 weeks after his latest request to Joseph Pelletier for pension information, Lindzen's employment was terminated by way of a phone call from Rudavsky and Weliky, allegedly due to lack of work.

111.     During the telephone call during which Lindzen was terminated, Rudavsky stated the following or words substantially to the same effect as "sorry for not getting back to you regarding your inquiries into our pension plan, unfortunately it was a bad year and as a result there is no pension benefits that are due you, but trust us, if something changes and it turns out there is something for you, we will be sure to let you know."

112.     As previously mentioned, Rudavsky and Weliky initially stated that the termination would be effective within 2 days along with Lindzen's health insurance.

113.    On information and belief this short notice was both atypical for MRW and also against their then policy that required at least two weeks' notice of terminations or resignations.

114.    On or about October 15, 2022 Rudavsky contradicted her prior statement regarding "lack of work" and asked whether Lindzen would be willing to work full time for another two or so weeks to take care of some pressing client matters.  Lindzen needed the money and so agreed.

115.    Lindzen also then sent emails requesting that his health insurance not be terminated immediately since this would potentially interfere with imminent medical treatments. MRW reluctantly later agreed.

116.    After his termination, Lindzen later learned that some ERISA pension information was publicly available online at the DOL and found information indicating that Rudavsky was the plan's administrator and that her prior statement about the pension "having a bad year" appeared to be incorrect and that MRW's pension fund assets had actually increased substantially over the year in question.

117.    Lindzen still has not received an SPD.

118.    By intentionally refusing to provide Lindzen an SPD, Messing, Rudavsky, Weliky and MRW violated ERISA, 29 U.S.C. §§ 1022, 1024(b)(4), 29 CFR § 2520.104b-2 and 29 CFR § 2520.104b-2.

119.    By terminating Lindzen shortly before his pension benefits may have vested, and after Lindzen's repeated requests for information thereon, MRW also violated the anti-retaliation provisions of ERISA. *See* 29 U.S.C. § 1140 ("It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this

subchapter, section 1201 of this title"). *See also* Williams v. Wright, CIVIL BPG-21-2076 (D. Md. July 19, 2022) (same).

120.    Because Messing, Rudavsky, Weliky and MRW violated ERISA by actively concealing and otherwise not providing Lindzen the requested SPD, Lindzen has a cause of action under 29 U.S.C. § 1132(c)(1)(B) for statutory penalties in the amount of up to $141 per day since Lindzen's first requests in 2022.

## CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTIES

121.    Plaintiff restates and incorporate by reference each of the foregoing paragraphs as if fully set forth therein.

122.    Plaintiff was a client of Defendants.

123.    Defendants are attorneys and the law firm these attorneys collectively own.

124.    Defendants, as Plaintiff's attorneys, owed Plaintiff a fiduciary duty.

125.    Defendants engaged in a conflicted business transaction with Plaintiff when they offered him employment at the same time as he was a client.

126.    Defendants at no time alerted Lindzen to the inherent conflict that they created by offering him employment at the same time he was a client.

127.    Defendants at no time obtained any informed consent from Lindzen as regarded the conflict they created.

128.    While Plaintiffs benefitted from the business transaction with Lindzen, Lindzen incurred damages from the transaction because it effectively made his role as a client subsidiary to his role as an employee thus diminishing the value of the independent counsel he had paid for.

129.     Lindzen incurred further damages because the conflict also hindered his ability to challenge the excessive fees that Defendants had charged Lindzen.

130.     Lindzen incurred further damages because as a result of the conflict he could no longer trust Defendants and therefore had to search for and pay for separate counsel.

131.     Defendants are therefore not entitled to the fees they charged Plaintiff after violating their fiduciary duties.

## COUNT II – BREACH OF CONTRACT

132.     Plaintiff restates and incorporate by reference each of the foregoing paragraphs as if fully set forth therein.

133.     Plaintiff had a contract with Defendants pursuant to which they were to provide Plaintiff legal services and bill fairly therefore.

134.     Defendants breached this contract by charging excessive fees because they billed excessively, in duplicate, and improperly.

135.     Defendants breached this contract by charging excessive fees because by virtue of the conflict they created Plaintiff did not receive the full value of the services paid for.

136.     Plaintiff was thus harmed because Plaintiff paid fees for services that were less than those contracted for.

## COUNT III – MASSACHUSETTS WAGE ACT, M.G.L. c. 149 § 148

137.     Plaintiff restates and incorporate by reference each of the foregoing paragraphs as if fully set forth therein.

138.     Plaintiff was an hourly employee of Defendants.

139.     Plaintiff regularly worked in excess of the hourly wages which he was paid.

140.    Defendants had actual and constructive knowledge that they were not paying Lindzen for all the hours he worked.

141.    Plaintiff has suffered damages as a result because he has never fully been paid for all of the hours that he worked for Defendants. Plaintiff has also incurred attorney's fees and litigation costs related to Defendants violations of the Wage Act.

### COUNT IV – RETALIATION UNDER M.G.L. c. 151B § 4(4)

142.    Plaintiff restates and incorporate by reference each of the foregoing paragraphs as if fully set forth therein.

143.    Plaintiff had adverse reactions to the COVID-19 vaccine including the diagnosis of glaucoma shortly after being vaccinated.

144.    Plaintiff therefore, and for other reasons, objected to Defendants new COVID-19 policy and requested an accommodation thereto.

145.    Defendants thereafter threatened retaliation against Plaintiff in response to his protected conduct.

146.    Defendants thereafter retaliated against Plaintiff by ostracizing him, reassigning work, treating him worse than other employees and ultimately terminating him.

147.    As a consequence of Defendants wrongful acts, Plaintiff suffered damages including the loss of employment; lost salary and benefits, reputational damages, humiliation, embarrassment, emotional and physical distress.  He also incurred attorney's fees and litigation costs.

## COUNT V – RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT

148.　　Plaintiff restates and incorporate by reference each of the foregoing paragraphs as if fully set forth therein.

149.　　Plaintiff had adverse reactions to the COVID-19 vaccine including the diagnosis of glaucoma shortly after being vaccinated.

150.　　Plaintiff therefore, and for other reasons, objected to Defendants new COVID-19 policy and requested an accommodation thereto.

151.　　Defendants thereafter threatened retaliation against Plaintiff in response to his protected conduct.

152.　　Defendants thereafter retaliated against Plaintiff by ostracizing him, reassigning work, treating him worse than other employees and ultimately terminating him.

153.　　As a result, Defendants violated the Americans with Disabilities Act.

154.　　As a consequence of Defendants wrongful acts, Plaintiff suffered damages including the loss of employment; lost salary and benefits, reputational damages, humiliation, embarrassment, emotional and physical distress. He also incurred attorney's fees and litigation costs.

## COUNT VI – VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

155.　　Plaintiff restates and incorporate by reference each of the foregoing paragraphs as if fully set forth therein.

156.　　Defendants maintain an employee pension benefit plan governed by ERISA.

157.　　Plaintiff was enrolled in Defendants' ERISA pension plan.

158.    Defendants actively concealed from Plaintiff details of their ERISA pension plan by denying his repeated requests for information thereon including the SPD.

159.    Defendants terminated Plaintiff within three weeks of his repeated requests and thus also retaliated against Plaintiff for his protected requests.

## PRAYER FOR RELIEF

1.  WHEREFORE, Plaintiff prays this Court to:

2.  Grant Plaintiff judgment under Counts I-VI;

3.  Under Count I, ORDER Defendants to disgorge to Plaintiff all fees they received for legal services after engaging in conflicted business transactions with Plaintiff without informed consent;

4.  Under Count II, ORDER Defendants to reimburse Plaintiff for excessive, improper and/or duplicative charges for legal fees paid by Plaintiff as a client;

5.  Under Count III, ORDER Defendants to pay Plaintiff three times his unpaid wages.

6.  Under Counts IV, V and VI ORDER Defendants to pay Plaintiff his lost wages and damages for emotional and physical distress, reputational harm, and other non-economic injuries;

7.  Under Count VI, ORDER Defendants to pay Plaintiff statutory damages in the amount of $144 per day during the period from the time of his first request for pension information to the present.

8.  Under Count, III, IV, V and VI order Defendants to pay Plaintiff's attorneys' fees and costs; and

9.  Grant such other relief as this Court deems just and proper.

**Plaintiff demands a trial by jury on all counts so triable.**

23

Respectfully submitted this 20th day of May, 2024,

Nathaniel M. Lindzen (BBO #689999)
Pro Se:

57 School Street
Wayland, MA 01778
(212) 810-7627
nlindzen@gmail.com